# In the
# United States Court of Appeals
## for the Sixth Circuit

MICHAEL SALAZAR, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

v.

PARAMOUNT GLOBAL, dba 247Sports,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville, No. 3:22-cv-00756.
The Honorable Eli J. Richardson, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLEE
## PARAMOUNT GLOBAL dba 247Sports

ROBB S. HARVEY
HOLLAND & KNIGHT LLP
Nashville City Center
511 Union Street
Suite 2700
Nashville, Tennessee 37219
(615) 244-6380

DAVID L. YOHAI
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Defendant-Appellee*

 

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5748                    Case Name: Salazar v. Paramount Global

Name of counsel:  David L. Yohai

Pursuant to 6th Cir. R. 26.1, Paramount Global
                                                          *Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
        identity of the parent corporation or affiliate and the relationship between it and the named
        party:

No

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
        in the outcome?  If yes, list the identity of such corporation and the nature of the financial
        interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ September 5, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David L. Yohai

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ........................................................................... 1

STATEMENT OF ISSUES .................................................................... 4

STATEMENT OF THE CASE .................................................................. 5

    A.    Factual Background ............................................................ 5

    B.    The Complaint ................................................................. 6

    C.    The District Court's Decision ................................................. 8

SUMMARY OF THE ARGUMENT ................................................................ 10

STANDARD OF REVIEW ..................................................................... 12

ARGUMENT ............................................................................... 13

I.    Mr. Salazar Failed to Plausibly Allege That He Was a "Subscriber of Goods or Services from a Video Tape Service Provider," as Required ........ 13

    A.    The VPPA Protects Only Consumers of Audiovisual Materials ........ 13

    B.    Because Mr. Salazar Did Not Subscribe to Audiovisual Materials, He Cannot Assert a Claim under the VPPA ...................... 18

    C.    Mr. Salazar's Interpretation of the VPPA Is Incorrect ........................ 21

II.    Mr. Salazar Failed to Plausibly Allege A VPPA Violation for Other Reasons ..................................................................... 32

    A.    Paramount Did Not Knowingly Disclose PII ...................... 33

    B.     Mr. Salazar Did Not Plausibly Allege He Watched Prerecorded Videos on 247Sports.com ....................................................................39

III.   The District Court Correctly Rejected Mr. Salazar's Request for Leave to Amend....................................................................................40

CONCLUSION ............................................................................................43

CERTIFICATE OF COMPLIANCE ..........................................................44

CERTIFICATE OF FILING AND SERVICE ............................... (*after addendum*)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alex v. NFL Enterprises LLC*,
No. 1:22-CV-09239 (ALC), 2023 WL 6294260 (S.D.N.Y. Sept.
27, 2023), *appeal filed*, No. 23-7455 (2d Cir. Oct. 23, 2023) ......................17, 31

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................31

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
Case No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230
(S.D.N.Y. Aug. 11, 2017) ................................................37

*Bliss v. Corr. Corp. of Am.*,
8 F. App'x 320 (6th Cir. 2001) ................................................41

*Buechler v. Gannett Co.*,
No. CV 22-1464-CFC, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ...................18

*Carroll v. Gen. Mills, Inc.*,
No. CV231746DSFMRWX, 2023 WL 6373868 (C.D. Cal. Sept. 1,
2023) ................................................2, 17

*Carter v. Scripps Networks, LLC*,
No. 22-cv-2031, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023)................*passim*

*Christian v. Altaire Pharms., Inc.*,
No. 20-6360, 2021 WL 3578812 (6th Cir. Aug. 10, 2021) ...............................43

*Clark v. Jackson*,
No. 22-5553, 2023 WL 2787325 (6th Cir. Apr. 5, 2023)...............................7, 34

*Corley v. United States*,
556 U.S. 303 (2009)................................................30

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) ................................................41, 42

iv

*D.D. v. Scheeler*,
   645 F. App'x 418 (6th Cir. 2016) ...............................................32, 33

*Doe v. Chao*,
   540 U.S. 614 (2004).......................................................................25

*Dubin v. United States*,
   599 U.S. 110 (2023).................................................................*passim*

*Edwards v. Learfield Commc'ns, LLC*,
   No. 1:23-cv-65-AW-MAF, 2023 WL 8544765 (N.D. Fla. Oct. 6,
   2023) .............................................................................................37

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) ........................................................34

*Ellis v. Cartoon Network, Inc.*,
   803 F.3d 1251 (11th Cir. 2015) ...............................................20, 31

*Gardener v. MeTV*,
   No. 22 CV 5963, 2023 WL 4365901 (N.D. Ill. July 6, 2023)...........17

*Ghanaat v. Numerade Labs*,
   No.: 4:23-cv-00833-YGR, 2023 WL 5738391 (N.D. Cal. Aug. 28,
   2023) .......................................................................................37, 38

*Golden v. NBCUniversal Media, LLC*,
   No. 22 CIV. 9858 (PAE), 2023 WL 5434378 (S.D.N.Y. Aug. 23,
   2023) ...............................................................................17, 20, 24

*Gundy v. United States*,
   139 S. Ct. 2116 (2019).................................................................21

*Heather v. Healthline Media, Inc.*,
   No. 3:22-cv-05059-JD, 2023 WL 8788760 (N.D. Cal. Dec. 19,
   2023) .......................................................................................16, 28

*Hillman v. Maretta*,
   569 U.S. 483 (2013).......................................................................24

*Holloway v. United States*,
   No. 19-5094, 2020 WL 497188 (6th Cir. Jan. 9, 2020) ..................42

*In re Hulu Priv. Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ......................................................8, 33, 37

*In re Hulu Priv. Litig.*,
    No. C 11–03764 LB, 2014 WL 2758598 (N.D. Cal. June 17, 2014) ................36

*Hunthausen v. Spine Media, LLC*,
    No. 3:22-CV-1970-JES-DDL, 2023 WL 4307163 (S.D. Cal. June
    21, 2023) .........................................................................................................17

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005) ..........................................................................................15

*Kuzenski v. Uproxx LLC*,
    No. 2:23-cv-00945-WLH-AGR, 2023 WL 8251590 (C.D. Cal.
    Nov. 27, 2023) ...........................................................................................17, 28

*Lamb v. Forbes Media LLC*,
    No. 22-CV-06319-ALC, 2023 WL 6318033 (S.D.N.Y. Sept. 28,
    2023) ................................................................................................................17

*Lebakken v. WebMD, LLC*,
    640 F. Supp. 3d 1335 (N.D. Ga. 2022) ............................................................18

*Louth v. NFL Enters. LLC*,
    No. 121CV00405MSMPAS, 2022 WL 4130866 (D.R.I. Sept. 12,
    2022) ................................................................................................................40

*Markels v. AARP*,
    No. 4:22-CV-5499-YGR, 2023 WL 6411720 (N.D. Cal. Aug. 29,
    2023) ................................................................................................................31

*Marshall v. Wayne County*,
    No. 22-1499, 2023 WL 2707222 (6th Cir. Mar. 30, 2023) ...........................7, 34

*Martin v. Meredith Corp.*,
    657 F. Supp. 3d 277 (S.D.N.Y. Feb. 17, 2023) ...............................................39

*McKethan-Jones v. Ohio Dep't of Health*,
    7 F. App'x 475 (6th Cir. 2001) ........................................................................12

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*,
  700 F.3d 829 (6th Cir. 2012) ............................................................41

*Peerless Ins. Co. v. Law Offices of Jason E. Taylor P.C.*,
  No. 19-cv-126, 2020 WL 4370941 (W.D.N.C. July 8, 2020) ............................35

*Perry v. Cable News Network, Inc.*,
  854 F.3d 1336 (11th Cir. 2017) ....................................................20, 31

*Puerto Rico v. Franklin Cal. Tax–Free Tr.*,
  579 U.S. 115 (2016)....................................................................30

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015) ..................................................36

*Salazar v. Nat'l Basketball Ass'n*,
  No. 1:22-CV-07935 (JLR), 2023 WL 5016968 (S.D.N.Y. Aug. 7,
  2023), *appeal filed*, No. 23-1147 (2d Cir. Sept. 16, 2022)..................17, 28, 42

*Solomon v. Flipps Media, Inc.*,
  No. 22-cv-5508 (JMA) (JMW), 2023 WL 6390055 (E.D.N.Y.
  Sept. 30, 2023), *appeal filed*, No. 23-7597 (2d Cir. Nov. 1, 2023)..............38, 40

*Stark v. Patreon, Inc.*,
  635 F. Supp. 3d 841 (N.D. Cal. 2022)..................................................40

*Talmer Bank & Tr. v. Minton Firm, P.C.*,
  660 F. App'x 439 (6th Cir. 2016) .....................................................42

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
  566 U.S. 560 (2012)....................................................................29

*Tansil v. Grange Ins. Co. of Mich.*,
  No. 12-13439, 2014 WL 12658836 (E.D. Mich. Feb. 5, 2014),
  *aff'd*, 172 F.3d 51 (6th Cir. 1998) (unpublished table decision) .......................35

*Tawam v. Feld Ent. Inc.*,
  No. 23-CV-357-WQH-JLB, 2023 WL 5599007 (S.D. Cal. July 28,
  2023) ................................................................................17

*United States v. Grenier*,
  513 F.3d 632 (6th Cir. 2008) .........................................................12

*United States v. Stauffer Chem. Co.*,
684 F.2d 1174 (6th Cir. 1982), *aff'd*, 464 U.S. 165 (1984)................................22

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).........................................................................22

*Walker v. Meta Platforms, Inc.*,
No. 22-cv-02442-JST, 2023 WL 3607282 (N.D. Cal. Mar. 3, 2023) ...............40

*Wis. Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018).....................................................................29

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
413 F.3d 553 (6th Cir. 2005) .............................................................6

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016).............................................................31

*Yoder v. Ingersoll-Rand Co.*,
31 F. Supp. 2d 565 (N.D. Ohio 1997) .................................................34

**Statutes**

Video Privacy Protection Act, 18 U.S.C. 2710 *et seq.* .....................................*passim*

**Other Authorities**

134 Cong. Rec. 10,260-61 (1988)....................................................25, 26

134 Cong. Rec. 31,068-71 (1988)........................................................26

S. REP. 100-599 ....................................................................25, 26, 27

*Video and Library Privacy Protection Act of 1988: J. Hearing on H.R.
4947 & S. 2361 Before the Subcomm. on Courts, Civil Liberties &
the Admin. of Justice of the H. Comm. on the Judiciary & the
Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary*,
100th Cong. (1988). ......................................................................25

Brandon Marcello, *Live video: 4-star RB Mark-Antony Richards
announcement*, https://247sports.com/college/auburn/Article/Live-
video-4-star-RB-Mark-Antony-Richards-announcement-
128777702/ ................................................................................39

Jamie Oakes, *LIVE stream: Implosion of UVA's UHall*,
https://247sports.com/Article/Virginia-Cavaliers-Basketball-LIVE-
stream-Implosion-of-UVA-UHall-University-Hall-House-that-
Ralph-Sampson-built-demolition-132312764/..................................................39

Facebook, *Cookies Policy* (Dec. 12, 2023),
https://www.facebook.com/policy/cookies/ ........................................7, 8, 34, 35

**INTRODUCTION**

The origin of the VPPA dates back to when a video cassette tape rental store disclosed to a Washington newspaper the titles of almost 150 video tapes Judge Bork had rented. To safeguard the privacy of video tape rentals and similar transactions, Congress enacted the Video Privacy Protection Act, 18 U.S.C. 2710 *et seq.* (the "VPPA"), in 1988. Drafted for a pre-Internet economy, the VPPA serves a narrow purpose—it ensures that consumers who rent, buy, or subscribe to audiovisual materials will not have their viewing choices leaked to the public.

The VPPA's plain text reflects this narrow purpose. It applies only to "video tape service provider[s]," defined as businesses engaged in the "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). And it protects only "consumer[s]" who are "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Both provisions demonstrate that the statute's reach is limited to audiovisual materials, and does not apply to written materials. Businesses that do not rent, sell, or deliver audiovisual materials are beyond the ambit of the statute. And individuals who do not rent, purchase, or subscribe to audiovisual materials are not "consumers" under the statute and have no claim.

In the past few years, there has been deluge of class action lawsuits that misapply the VPPA to any website which features video content alongside text- and

image- based content, even if the website is freely accessible to any casual visitor without the need to make a purchase or supply any information to the website. These new lawsuits have targeted entities that bear little resemblance to the store from which Judge Bork rented video tapes, including investment-analysis companies, breakfast-cereal manufacturers, and, as in this case, sports news outlets.[1] Many of these cases have focused on the alleged use of a marketing tool called the Meta Pixel, which plaintiffs generally allege is used by defendants to transmit information about what videos they watch to Meta in violation of the VPPA.

The VPPA authorizes $2,500 in "liquidated damages," making it an attractive vehicle for class action litigation. But the statute itself was enacted in the late 1980's, when video rental stores were prevalent and people took video cassette tapes home to watch, and does not address the use of marketing tools like the Meta Pixel on freely accessible websites. This has required the plaintiff bar to come up with a new theory for why their plaintiffs can bring claims under the VPPA, which as noted, allows claims from only "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

One common tactic—which was employed without success before the District Court here—is to assert that plaintiffs who enter their email addresses to receive an

---

[1] *See, e.g., Carroll v. Gen. Mills, Inc.*, No. CV231746DSFMRWX, 2023 WL 6373868, at *4 (C.D. Cal. Sept. 1, 2023).

email newsletter should be considered "subscribers" within the meaning of the statute. Joining the ranks of at least a dozen courts who have rejected such an attempted end-run around the VPPA's statutory standing requirement, the District Court here correctly found that one must subscribe to audiovisual materials to have a claim, and that a free email newsletter simply does not qualify.

In his opening brief, Plaintiff-Appellant Michael Salazar (hereinafter, "Mr. Salazar") almost exclusively argues points that are irrelevant to this appeal. Indeed, his digressions into standing and his attempted re-casting of the statutory interpretation analysis at issue do not address the most relevant issue before this Court. That issue is whether Mr. Salazar plausibly alleged he was a "consumer" within the meaning of the VPPA where he alleged only signing up for 247Sports.com's email newsletter, not subscribing to audiovisual materials. 18 U.S.C. § 2710(a)(1). Consistent with the VPPA's plain text, history, and purposes, as well as the weight of authority from other courts, the District Court correctly found that he cannot, and this Court should affirm its judgment.

In addition, there are other pleading deficiencies in Mr. Salazar's original complaint that provide independent, alternative grounds for affirming the District Court's decision. For example, Mr. Salazar failed to plausibly allege that Paramount "knowingly" disclosed his PII, as required to state a claim under the VPPA, including because the cookie that allegedly disclosed his information was Meta's,

not Paramount's. Moreover, he never alleged whether he watched prerecorded, as opposed to live-streamed videos, which are excluded from the statute.

This Court should also reject Mr. Salazar's last-ditch effort to resurrect his deficient claim by seeking leave to amend: Mr. Salazar failed to assert both in the District Court and on appeal how any proposed amendment would rectify the pleading deficiencies of his complaint.

## STATEMENT OF ISSUES

The issues before the Court are:

1.     Mr. Salazar alleges that he signed up for the 247Sports.com newsletter, but does not allege that he subscribed to audiovisual materials. Is Mr. Salazar a protected "consumer" under the VPPA?

2.     Mr. Salazar alleges that when Facebook users with certain Facebook cookies on their web browsers visit 247Sports.com, personal information is "transmitted to Facebook by the user's browser." In addition, Mr. Salazar does not specify whether he watched live-streamed or pre-recorded videos. Are there other grounds on which to affirm the dismissal of Mr. Salazar's complaint?

3.     Mr. Salazar included a one-sentence request for leave to amend in his opposition to the motion to dismiss, but did not file a motion to amend or a proposed amended complaint. Did the District Court abuse its discretion in rejecting this request?

## STATEMENT OF THE CASE

Mr. Salazar asserts that by signing up for the 247Sport.com Newsletter, he became a protected "subscriber" within the meaning of the VPPA. *See, e.g.*, Complaint, RE 1, Page ID #6, 13. The District Court disagreed, dismissing Mr. Salazar's case on the basis that he did not fall within the category of people the VPPA sought to protect. Memorandum Opinion and Order, RE 33, Page ID # 287. The District Court found that Mr. Salazar's subscription to an email newsletter containing no videos did not make him a "renter, purchaser, or subscriber of goods or services from a video tape service provider," as required by the statute. *Id.*; 18 U.S.C. § 2710(a)(1). This appeal followed.

### A.   Factual Background

247Sports.com is a news website providing coverage of various college sports. *See, e.g.*, Complaint, RE 1, Page ID #11 (displaying a screenshot of an article titled "UCF LB Terrence Lewis, former 5-star recruit, plans to transfer"). Visitors to the site may view free news articles, team rankings, photographs, and videos, among other content.

Visitors can also sign up to receive via email 247Sports.com's online newsletter (the "Newsletter"), which contains links to articles, still photos and other content on the website. *See* Memorandum in Support of Motion to Dismiss, RE 17, Page ID # 78-82. The Newsletter itself does not contain videos. Exhibit A to the

Motion to Dismiss, RE 17-1, Page ID # 95-100.[2]  Nor does signing up for the Newsletter provide individuals with a login or access to exclusive or restricted video content on the website.  *See id.*  Videos linked in the 247Sports.com Newsletter can be accessed by casual visitors of the website, regardless of whether they have signed up for the Newsletter.  *See id.*

**B.     The Complaint**

On September 27, 2022, Mr. Salazar brought this suit in the Middle District of Tennessee, alleging a violation of the VPPA.  *See generally* Complaint, RE 1. Mr. Salazar alleged that he subscribed to 247Sports.com's Newsletter in 2022.  *Id.* Page ID #4, 6; Opposition to Motion to Dismiss, RE 24, Page ID # 127 ("Plaintiff Michael Salazar was a 247's [sic] newsletter subscriber.").  He did not allege that he ever created an account on the 247Sports.com website, nor did he allege that he requested or obtained any videos within the Newsletter, or that 247Sports.com disclosed to Facebook (or anyone else) that he requested or obtained any videos in the Newsletter.

Instead, Mr. Salazar alleged that "Personal Viewing Information" regarding videos a visitor "viewed on 247Sports.com" is transmitted to Facebook.  Complaint,

---

[2] The Court may consider the sample Newsletter attached to Paramount's motion because the Newsletter is referenced in the allegations, and it is the subject of the Complaint.  *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (explaining that a court may consider "materials that are integral to the complaint . . . or are otherwise appropriate for the taking of judicial notice.").

RE 1, Page ID #2. Mr. Salazar defined "Personal Viewing Information" as "digital subscribers' unique [Facebook ID ("FID")] and video content viewed," which Mr. Salazar contends is shared "together as one data point to Facebook." *Id.* Information regarding the videos that individuals watch is allegedly transmitted through the Meta Pixel, a piece of code that was installed on the 247Sports.com website. *Id.*

Separately, visitors' FIDs are allegedly collected and transmitted through Meta's "personally identifiable FID cookies on [the visitor's] browser." *Id.* at 9. According to the complaint, the FID cookies on Facebook users' browsers cause the browser to transmit individuals' identities to Facebook. The only "personally identifiable FID cookie[]" the Complaint identifies by name is the Facebook c_user cookie. *Id.* at 12. The c_user cookie is a Facebook cookie used to "keep [users] logged in" and to "remember [users'] browsers so [they] don't have to keep logging in to Facebook." Facebook, *Cookies Policy* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (click "Authentication") (emphasis added) (stating "*we* use the 'c_user' cookie[.]").[3] The cookie contains "the logged-

---

[3] The Court may consider Facebook's website because it is integral to the Complaint, including because Appellant specifically references and relies upon it. Complaint, RE 1, Page ID #10 ("Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website."); *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *2 (6th Cir. Apr. 5, 2023) (finding the district court had not abused its discretion in considering certain emails that were "referenced . . . in [plaintiff's] amended complaint" and thus "integral to the complaint"); *Marshall v. Wayne County*, No. 22-1499, 2023 WL 2707222, at *2

in user's Facebook user ID expressed in a numeric format." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1094 (N.D. Cal. 2015).

Mr. Salazar alleges that these "personally identifiable FID cookies" reside "on [a Facebook user's] *browser*." Complaint, RE 1, Page ID #9 (emphasis added). Similarly, Mr. Salazar alleges that "the digital subscribers [sic] identity" is "transmitted to Facebook *by the user's browser*." *Id.* (emphasis added). Accordingly, Mr. Salazar does not—and cannot—allege that *Paramount* transmitted his identity to Facebook. In addition, in depicting the alleged transmission, Mr. Salazar's complaint did not show his Facebook ID—when one appends this FID to the Facebook website URL (*i.e.*, www.facebook.com/100003190670927) while logged into Facebook, it leads to the Facebook profile of an unrelated person named Jacob Brown, not Mr. Salazar. And while a Facebook ID may be used to find a Facebook profile, Mr. Salazar did not allege that his Facebook profile includes his name or any other information that could be used to identify him.

## C.    The District Court's Decision

On July 18, 2023, the District Court granted Paramount's motion to dismiss. Memorandum Opinion and Order, RE 33, Page ID # 287. While it found Mr. Salazar had Article III standing, it dismissed the complaint based on his failure to sufficiently

(6th Cir. Mar. 30, 2023) ("[O[n] appeal we consider only Marshall's operative amended complaint and documents referred to in the complaint and central to it.").

8

allege that he is a "subscriber of goods or services from a video tape service provider." *Id.* at Page ID # 281-87. The District Court explained that when the VPPA is "properly interpreted as a whole, it becomes clear that a plaintiff is not necessarily 'a subscriber of video-tape related goods or services' *even if* the plaintiff can be considered a 1) subscriber, 2) of goods or services (of some kind); (3) from a video tape service provider. Instead, the plaintiff must be a subscriber of goods and services *in the nature of audio-video* content." *Id.* at Page ID # 284 n.23.

Applying this test to Mr. Salazar, the District Court found that he could not properly be considered a "subscriber" as defined by the VPPA, noting that "the complaint in this case does not allege that an individual can only access the video content from 247Sports.com through signing up for the newsletter." *Id.* at Page ID # 285. The District Court further emphasized that "it appears from the complaint that any individual can access the video content on 247Sports.com without having to sign up for the newsletter or otherwise register for an account on 247Sports.com[,]" and that Mr. Salazar did not "even allege that he accessed video content through the receipt and review of the newsletter." *Id.* at Page ID # 285-86. Because the District Court dismissed the case on this threshold basis, it declined to reach the additional grounds for dismissal set forth in Paramount's motion to dismiss. *Id.* at Page ID # 282.

The District Court also rejected Mr. Salazar's threadbare request for leave to amend in granting the motion to dismiss, describing the order as "the final order in the case." *Id.* at Page ID # 287. This appeal followed.

## SUMMARY OF THE ARGUMENT

I. For a plaintiff to be considered a "consumer" within the meaning of "the *Video* Privacy Protection Act[,]" they must plausibly allege having subscribed to "audio visual materials[,]" and the written Newsletter simply does not qualify. Memorandum Opinion and Order, RE 33, Page ID # 284-85.

A. The plain text of the VPPA only applies to consumers of audiovisual materials. It prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). It defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[,]" *id.* § 2710(a)(1), and a "video tape service provider[,]" in relevant part, as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). The definitions of "consumer" and "video tape service provider" are paired: "renter" with "rental," "purchaser" with "sale," and "subscriber" with "delivery[.]" *Id.* §§ 2710(a)(1), (a)(4). Subsection (a)(4) applies all of these terms to "prerecorded video cassette tapes" or "audio visual materials."

*Id.*  This symmetry demonstrates that the VPPA covers "audio visual materials[,]" not written materials such as the Newsletter.

B.   Signing up for the Newsletter does not qualify Mr. Salazar as a "subscriber" of audiovisual materials or services.  The Newsletter is an email sent to individuals which affords no access to exclusive or restricted video content on the 247Sports.com website.  *See* Exhibit A to Motion to Dismiss, RE 17-1, Page ID # 95-100.  Allowing Mr. Salazar to bring a VPPA claim would contradict the statute's requirement that plaintiffs must be "subscribers" to bring claims, given Mr. Salazar has no commitment to or relationship with 247Sports.com's audiovisual materials.  18 U.S.C. § 2710(a)(1).

C.   Mr. Salazar's three arguments that he should still be considered a "consumer" within the meaning of the VPPA all fail.  He argues that phrase "goods or services" should be interpreted in isolation, but this argument ignores the fundamental rule of statutory interpretation that requires consideration of the statutory context.  *Dubin v. United States*, 599 U.S. 110, 121 (2023).  In addition, Mr. Salazar argues that the Newsletter is itself audiovisual material, but this too fails, because the Newsletter—regardless of the content to which it links—is no more "audio visual" than a print newspaper or magazine that contains movie reviews, advertisements, and show times.  Lastly, Mr. Salazar's argument that the term "subscriber" should be interpreted to mean "recipient" given the interplay between

the VPPA's provisions also ignores the term's ordinary meaning and its placement in the statute.  *See* 18 U.S.C. § 2710(a)(1).

II.    This Court may also affirm the District Court's decision on certain alternative bases, given other deficiencies in Mr. Salazar's claim.  For instance, Mr. Salazar did not plausibly allege that Paramount knowingly disclosed PII, including because the cookie to which he points in articulating the alleged disclosure is not Paramount's cookie, is not disclosed by Paramount, and in this case, does not even point to his own Facebook profile.  *See* Complaint, RE 1, Page ID #9, #12.  Mr. Salazar also failed to plead whether he watched prerecorded, as opposed to live-streamed videos on 247Sports.com, as was required for him to state a claim here.  18 U.S.C. § 2710(a)(4).

III.    The District Court properly rejected Mr. Salazar's one sentence request for leave to amend the complaint.  Mr. Salazar failed in the District Court to identify any potential amendment that would cure the defects in his complaint, and he still fails to do so on appeal.

## STANDARD OF REVIEW

This Court reviews *de novo* the grant of a motion to dismiss for failure to state a claim.  *United States v. Grenier*, 513 F.3d 632, 636 (6th Cir. 2008).  This Court reviews a denial of leave to amend for abuse of discretion.  *McKethan-Jones v. Ohio Dep't of Health*, 7 F. App'x 475, 482 (6th Cir. 2001).

**ARGUMENT**

## I.     Mr. Salazar Failed to Plausibly Allege That He Was a "Subscriber of Goods or Services from a Video Tape Service Provider," as Required

To plead a claim under the VPPA, a plaintiff must plausibly allege—among other things—that he or she is a "consumer" of the defendant "video tape service provider." 18 U.S.C. § 2710(a)(1). Mr. Salazar is not a "consumer" within the meaning of the VPPA because he did not subscribe to audiovisual materials. The District Court correctly so held, in accord with at least a dozen recent decisions that have reached the same conclusion. *E.g.*, *Carter v. Scripps Networks, LLC*, No. 22-cv-2031, 2023 WL 3061858, at *4 (S.D.N.Y. Apr. 24, 2023).

### A.     The VPPA Protects Only Consumers of Audiovisual Materials

The VPPA is a narrowly drawn statute, focused exclusively on audiovisual materials. It shields from disclosure only personal information concerning audiovisual materials. It applies only to businesses that rent, sell, or deliver those materials. And it protects only consumers who rent, purchase, or subscribe to those materials. All three elements of the statutory scheme—what it prohibits, who is prohibited, and who is protected—work in tandem to safeguard the privacy of consumers of audiovisual materials.

The core of the statute is the "personally identifiable information" that it protects. The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or

services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Only "video tape service provider[s]" may be liable under the VPPA for knowing disclosures of personally identifiable information. *Id.* at § 2710(b)(1). A "video tape service provider" is a person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* at § 2710(a)(4). Only "consumer[s]" of video tape service providers are protected by the statute. A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* at § 2710(a)(1). All these statutory provisions work in tandem and address the same subject matter: audiovisual materials.

As the District Court observed and Mr. Salazar acknowledges, there is a particular symmetry in the VPPA's definitions of "video tape service provider" and "consumer." Memorandum Opinion and Order, RE 33, Page ID # 283-84; Br. at 52. The same transaction that makes a business a statutory "video tape service provider" also makes the counter-party to that transaction a statutory "consumer." As one district court put it, "[t]he definitions of 'consumer' and 'video tape service provider' are paired to some degree: renter with rental, purchaser with sale, and subscriber with delivery, all of which subsection (a)(4) applies to audio visual materials." *Carter*, 2023 WL 3061858, at *6. So "the scope of a 'consumer,'" when read properly in conjunction with other VPPA provisions, "is cabined by the definition

14

of 'video tape service provider,' with its focus on the rental, sale or delivery of audio visual materials." *Id*.

Thus, "[i]n the statute's full context, a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large." *Id.* at \*6. Subsection (b)(1) therefore "provides a right of action to a 'consumer' (e.g., 'renter, purchaser, or subscriber') of 'such provider' (e.g., one engaged in 'the business . . . of rental, sale, or delivery of . . . audio visual materials')." *Id.* All that is to say, the VPPA provides a cause of action only to consumers who rent, purchase, or subscribe to prerecorded audiovisual materials. It does not apply to consumers of other products.

The same conclusion follows from the statute's use of the term "services," which appears in the definitions of both "personally identifiable information" and "consumer," and is referenced in the term "video tape service provider." As the Supreme Court has repeatedly held, "identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The "personally identifiable information" shielded from disclosure by the VPPA must concern "specific *video* materials or *services* from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). To qualify as a "video tape *service* provider," a business must rent, sell, or deliver "prerecorded . . . audio visual materials." *Id.* at § 2710(a)(4).

And the "consumer[s]" protected by the statute must rent, purchase, or subscribe to "goods or *services* from a video tape service provider." *Id.* at § 2710(a)(1) (emphasis added). In all these parallel provisions, the term "services" means the same thing: audiovisual services. *See Heather v. Healthline Media, Inc.*, No. 3:22-cv-05059-JD, 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023) (citations omitted) ("[I]t would be 'illogical, or very poor legislative drafting,' to use the same word, 'service,' in close proximity, while giving it different meanings[,]" so "the 'services' a subscriber receives are presumptively the same 'services' that would render [defendant] a 'video tape service provider'").

That the VPPA applies only to consumers of audiovisual materials is reinforced by Congress's repeated references to "video" and "audio visual" materials in the statute. These references include: (a) "goods or services from a <u>video tape</u> service provider[,]" (b) "<u>prerecorded video cassette tapes</u> or similar <u>audio visual</u> materials," (c) "specific <u>video</u> materials or services from a <u>video tape</u> service provider," (d) the liability section's title ("<u>Video tape</u> rental and sale records"), and, most notably, (e) the statute's title. 18 U.S.C. §§ 2710(a)(1), (a)(3), (a)(4) (emphasis added); *Dubin*, 599 U.S. at 121 (using statute's "title and place in the statutory scheme to shed light on its text.").

While no other court of appeals has yet decided the issue, the overwhelming weight of district court authority is in accord with the decision below, as Mr. Salazar

acknowledges.[4]  Br. at 26 n.3 (listing eight decisions); *Golden v. NBCUniversal Media, LLC*, No. 22 CIV. 9858 (PAE), 2023 WL 5434378, at *9 (S.D.N.Y. Aug. 23, 2023) ("The Court has also drawn on Judge Castel's thoughtful decision reaching the same result on substantially similar allegations."); *Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) ("*Carter* is most persuasive on this point."); *Salazar v. Nat'l Basketball Ass'n*, No. 1:22-CV-07935 (JLR), 2023 WL 5016968, at *8-9 (S.D.N.Y. Aug. 7, 2023) (incorporating statutory interpretation of the *Carter* court), *appeal filed*, No. 23-1147 (2d Cir. Sept. 16, 2022); *Kuzenski v. Uproxx LLC*, No. 2:23-cv-00945-WLH-AGR, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023) (same); *Hunthausen v. Spine Media, LLC*, No. 3:22-CV-1970-JES-DDL, 2023 WL 4307163, at *3 (S.D. Cal. June 21, 2023) (same); *Alex v. NFL Enterprises LLC*, No. 1:22-CV-09239 (ALC), 2023 WL 6294260, at *3-4 (S.D.N.Y. Sept. 27, 2023) (same), *appeal filed*, No. 23-7455 (2d Cir. Oct. 23, 2023); *Carroll*, 2023 WL 6373868, at *4 (same); *Tawam v. Feld Ent. Inc.*, No. 23-CV-357-WQH-JLB, 2023 WL 5599007, at *5 (S.D. Cal. July 28, 2023)

---

[4] Shortly before this appeal was filed, Mr. Salazar appealed to the Second Circuit from the dismissal of his near-identical complaint in *Salazar v. Nat'l Basketball Ass'n*, No. 1:22-CV-07935 (JLR), 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023). Briefing in that appeal (docketed as Second Circuit case 23-1147) is complete, but the Court has not yet issued a ruling.

(same); *Lamb v. Forbes Media LLC*, No. 22-CV-06319-ALC, 2023 WL 6318033, at *12 (S.D.N.Y. Sept. 28, 2023) (same).[5]

### B. Because Mr. Salazar Did Not Subscribe to Audiovisual Materials, He Cannot Assert a Claim under the VPPA

Mr. Salazar alleges a disclosure of "video content viewed" on 247Sports.com. Complaint, RE 1, Page ID #2. But Mr. Salazar does not allege that he subscribed to (or rented or purchased) any "video content" that was supposedly disclosed. Instead, he claims only that he "sign[ed] up for an online newsletter" from 247Sports.com. *Id.* at Page ID #6. Because the Newsletter is not audiovisual material, Mr. Salazar is not a "consumer" within the meaning of the VPPA. The District Court therefore properly dismissed his complaint.

The Newsletter is an email sent to individuals that contains links to articles, still photos, and other content. *See* Exhibit A to Motion to Dismiss, RE 17-1, Page ID # 95-100. It does not contain videos. Nor does it function as a login or otherwise

---

[5] Mr. Salazar identifies just two recent decisions supporting his proposed interpretation of the VPPA—but which are outliers among the many decisions on the issue presented. Br. at 38. These decisions did not analyze the VPPA's plain text and the symmetry identified above to determine whether the VPPA covers non-video materials. *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340 (N.D. Ga. 2022) (asserting, without further textual analysis, that "[t]o constitute a 'consumer' . . . the plaintiff must subscribe to 'goods or services from a video tape service provider,' not a video service[.]"); *Buechler v. Gannett Co.*, No. CV 22-1464-CFC, 2023 WL 6389447, at *2 (D. Del. Oct. 2, 2023) (concluding defendant's newsletter fell within the scope of the VPPA without analyzing whether the VPPA by its plain text reasonably encompasses non-video materials).

provide individuals with access to exclusive or restricted video content on 247Sports.com. *See id.* Any videos to which the Newsletter contains links can be accessed by casual visitors of the website who have not signed up for the Newsletter. *See* Exhibit A to Motion to Dismiss, RE 17-1, Page ID # 95-100. Although Mr. Salazar now insinuates otherwise,[6] his own complaint reveals that the video content on 247Sports.com is available to anyone who points a web browser to the site. *See id.*; *see also* Memorandum Opinion and Order, RE 33, Page ID # 286 ("[I]t appears from the complaint that any individual can access the video content on 247Sports.com without having to sign up for the newsletter or otherwise register for an account on 247Sports.com."). In other words, the Newsletter is a written offering distinct from the videos offered by 247Sports.com. By signing up for the Newsletter, Mr. Salazar agreed to receive text in an email. He did not subscribe to audiovisual materials.

Case after case has found that newsletters and similar text-based offerings simply do not come within the ambit of the VPPA. *E.g., Carter,* 2023 WL 3061858, at *6 ("The newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as

---

[6] *See* Br. at 49 ("the general public did not share the same access to Paramount's video content").

viewers. Plaintiffs were free to watch or not watch hgtv.com videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site."); *Golden*, 2023 WL 5434378, at *11 ("[T]he FAC is devoid of allegations linking Golden's having signed up for the email newsletter to her viewing of Today.com's video offerings. The FAC does not allege that Golden's access of these videos was facilitated in any way by her having signed up for the newsletter. As such, the FAC's allegations regarding the newsletter do not qualify Golden as a 'subscriber' under the VPPA."); *see also supra* at 17 (collecting cases).

Allowing Mr. Salazar to assert a VPPA claim would also transgress the limitation imposed by Congress that a plaintiff must be a "subscriber" (or renter or buyer, which are not at issue here). As the Eleventh Circuit held when interpreting the VPPA, "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256-57 (11th Cir. 2015) (downloading a free mobile app is not enough to qualify; the indicia of subscription status include "some or [most] of the following [factors]: payment, registration, commitment, delivery, [expressed association], and/or access to restricted content") (alterations in original and citation omitted); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342 (11th Cir. 2017) (plaintiff failed to establish he was a "subscriber" "because he has not demonstrated an ongoing commitment or relationship with CNN" where he

did not, among other things, "make any commitment or establish any relationship that would allow him to have access to exclusive or restricted content.") (citation omitted).

Mr. Salazar has no commitment to or relationship with any audiovisual material available on 247Sports.com. He has the same access and the same relationship to video content as any casual visitor to the site. He is therefore not among the "consumers" of video tape service providers that the VPPA protects.

## C.    Mr. Salazar's Interpretation of the VPPA Is Incorrect

Mr. Salazar asserts three arguments why he should nonetheless be deemed a "consumer" under the VPPA. First, he argues the phrase "goods or services" should be interpreted in isolation from the rest of the statute, and interpreted to have a different meaning than other marginally different phrases used in the statute. Br. at 35-42. Second, Mr. Salazar contends that even if the VPPA is interpreted to apply only to audiovisual materials, the Newsletter still qualifies. *Id.* at 47-49. Third, Mr. Salazar also contends that if the VPPA only applies to audiovisual materials, then the word "subscriber" in the statute should be interpreted to mean "recipient." *Id.* at 51-53. None of these arguments are persuasive.

1. Mr. Salazar begins by violating a cardinal rule of statutory interpretation: He zeroes in on one phrase of the statute "in isolation," without "look[ing] to statutory context." *Dubin*, 599 U.S. at 119; *Gundy v. United States*, 139 S. Ct. 2116,

2126 (2019) (statutory interpretation "determines meaning by looking not to isolated words, but to text in context, along with purpose and history").[7]  In fact, according to Mr. Salazar, the meaning of "goods and services" in isolation is the "only . . . question" presented by the appeal. Br. at 13, 35-36. And because Mr. Salazar believes this term, standing on its own, is capacious enough to include a newsletter, he contends that he can seek statutory damages under the VPPA.  Br. at 32-46.

That is no way to interpret an act of Congress.  "After all, a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words."  *Dubin*, 599 U.S. at 120 (internal quotation marks omitted).  "[L]inguistic and statutory context also matter," and "reading the whole phrase can point to a more targeted reading." *Id.* (internal quotation marks omitted).  That is why Mr. Salazar's definition of "goods and services" to mean "society's entire economic output" is off the mark.  Br. at 37.  Neither the VPPA as a whole nor any of its provisions concerns the whole economy writ large.  It has smaller game in its sights: "specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3). Only "video tape service provider[s]" engaged in the "rental, sale, or delivery" of

---

[7] *See also United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1184 (6th Cir. 1982) ("A statute should be read and construed as a whole and, if possible, given a harmonious, comprehensive meaning."), *aff'd*, 464 U.S. 165 (1984); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[S]tatutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute.'").

those goods or services are subject to the VPPA. *Id.* § 2710(a)(4). And only "renter[s], purchaser[s], or subscriber[s]" of those "goods or services from a video tape service provider" are protected by it. *Id.* § 2710(a)(1).[8]

Mr. Salazar's only nod to statutory context is a misguided argument about minor variations in wording among closely related provisions that are plainly intended to work in tandem. He notes that one VPPA provision "used the term 'video materials or services"; another "deployed the term 'prerecorded video cassette tapes or similar audio visual materials"; and another—the definition of consumer—refers to "goods or services from a video tape service provider." *See* Br. at 39. From this, he concludes that the definition of "consumer" extends to the entire economy, whereas every other VPPA provision reaches only prerecorded audiovisual materials.

But Congress need not robotically reproduce identical wording in every provision of a statute to maintain the subject matter of the legislation. "Even if there are some small differences in the statutory language, . . . they do not diminish the

---

[8] Indeed, rather than make "little sense" as Mr. Salazar suggests, the District Court's statement that it was not deciding whether the Newsletter was a "good[] or service[]" makes perfect sense. Br. at 27 n.4. The District Court correctly analyzed the VPPA as a whole—including the repeated references to video material—in reaching its conclusion that to be a "subscriber of goods or services from a video tape service provider," one must subscribe to video materials. Memorandum Opinion and Order, RE 33, Page ID # 284-85; *id.* Page ID # 281 n.19. It rightly did not read the terms "goods or services" in isolation from the rest of the statute. *See id.*

critical similarity shared by the" VPPA's provisions: all concern audiovisual goods or services. *Hillman v. Maretta*, 569 U.S. 483, 494 n.3 (2013) (internal quotation marks omitted) (evaluating differences in language of statutes establishing insurance programs). Congress had no need to repeat the term "prerecorded video cassette tapes or similar audio visual materials" in § 2710(a)(1), because it incorporated the defined term "video tape service provider" into that subsection. *Golden*, 2023 WL 5434378, at *11. And the natural interpretation of § 2710(a)(1) is that the "goods or services" referenced in that subsection are the same goods or services rented, sold, or delivered by a video tape service provider—and not, for example, written materials like the Newsletter. *Id.*[9]

Mr. Salazar's argument concerning variations in statutory language is especially weak in light of the statute's legislative history. Br. at 41. The drafting history provides the explanation for why the VPPA uses different phrasing in § 2710(a)(3) and § 2710(a)(1), and nothing about this history supports Mr. Salazar's

---

[9] Mr. Salazar also points to differences in the phrasing of § 2710(b)(2)(D)(ii), which permits certain disclosures which do not "identify the title, description, or subject matter of any video tapes or other audio visual material." Br. at 39. He claims to find it surprising that Congress would use the phrase "video tapes or other audio visual material[,]" rather than "goods or services from a video tape service provider," as in § 2710(a)(1). But the varied phrasing makes perfect sense given § 2710(b)(2)(D)(ii)'s purpose of allowing certain disclosures about the specific videos individuals request or obtain. Unlike specific videos, "services" often lack a "title" or clear "subject matter[,]" as services might include, for example, a streaming subscription plan to a platform offering a variety of content.

argument that the VPPA is meant to apply to "consumers" who subscribe to non-video materials, but protect them only against disclosures about their receipt of video materials. *Cf. Doe v. Chao*, 540 U.S. 614, 622 (2004) (relying on drafting history "showing that Congress cut out" language in statute to find plaintiffs bringing Privacy Act claims had to show actual damages to obtain statutory damages).

In legislation that later became the VPPA, "the bill's sponsors, Senators Leahy, Grassley, Simpson and Simon, included a similar protection for library borrower records, recognizing that there is a close tie between what one views and what one reads." S. REP. NO. 100-599, at 8 (1988). This proposed version of the VPPA contained parallel provisions forbidding "video tape service provider[s]" and "librar[ies]" from releasing "personally identifiable information" about their "consumers" and "patrons," respectively. See 134 Cong. Rec. 10,260-61 (1988) (statement of Sen. Patrick Leahy); *accord Video and Library Privacy Protection Act of 1988: J. Hearing on H.R. 4947 & S. 2361 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary & the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary*, 100th Cong. 10-11, 13 (1988), https://catalog.hathitrust.org/Record/008516708 ("VPPA Hearing").

The liability clause for video tape service providers, the definition of "consumer," and (in relevant part) the definition of "video tape service provider" were worded identically to the ultimately enacted statute. *See* 134 Cong. Rec.

10,260; VPPA Hearing at 10-11. But the definition of "personally identifiable information"—which eventually became 18 U.S.C. § 2710(a)(3)—was not limited to video materials, because it was a shared definition for both the library- and video-related portions of the bill. *See* 134 Cong. Rec. 10,260; VPPA Hearing at 10.

Accordingly, the bill defined "personally identifiable information" as "information which identifies a person as having requested or obtained specific materials or services from a video tape service provider or library." 134 Cong. Rec. 10,260; *see* VPPA Hearing at 10 (same). Ultimately, however, the library-related portions were removed, due to disagreement as to the application of such provisions for "law enforcement." S. REP. NO. 100-599, at 8. Instead of rewriting the definition of PII, Congress added the word "video" before "materials" to "make clear" that the enacted statute applied only to video materials and deleted the words "or library." *See* 134 Cong. Rec. 31,068-69, 31,071.

This drafting history—first including written materials in the statute's coverage, then omitting them—explains why some provisions are worded slightly differently than others. But nothing in the VPPA's final text or its drafting history suggests that Congress intended the statute to apply to consumers of an email newsletter.

Mr. Salazar also argues that a passage from the VPPA's legislative history favors his proposed interpretation, namely:

The definition of personally identifiable information includes the term "video" to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products.

S. Rep. 100-599, at 12; Br. at 44. But the passage in fact indicates the VPPA was not intended to cover all the goods and services offered by a video tape service provider, but rather "only those transactions involving the purchase of video tapes[.]" S. Rep. 100-599, at 12. Moreover, there is no indication in this passage, as Mr. Salazar suggests, that Congress intended the definition of "personally identifiable information" to be interpreted more narrowly than the definition of "consumer." Br. at 44.

2. Mr. Salazar next argues that the Newsletter itself *is* audiovisual material, even though it contains no audiovisual content. Br. at 47-49. This is so, he contends, because the Newsletter included links to videos and "enticed or encouraged [people] to watch" them. Br. at 47.

Links to video and other content are commonly included in emails and other written materials. This brief contains a link to an audio file of an oral argument before this Court.[10] But the brief itself is not an audio recording. For the same

---

[10] Oral Argument, *Saalim v. Walmart, Inc.*, No. 23-3217 (6th Cir. Jan. 10, 2024) https://www.opn.ca6.uscourts.gov/internet/court_audio/audio/01-10-2024%20-

reason, the emailed newsletter is not an audiovisual recording. And just as a poster advertising a movie is not a movie, a textual email encouraging readers to watch a video is not a video. Mr. Salazar's argument to the contrary continues to ignore that the VPPA's interlocking definitions all fit together. The audiovisual goods and services that a business rents, sells, or delivers to become "video tape service provider" are the same goods and services a person must rent, purchase, or subscribe to in order to be a "consumer" of a video tape service provider.

Again, the relevant authority is all in accord. *See NBA*, 2023 WL 5016968, at *10 ("[L]inks to video content which is generally accessible on the NBA.com website are insufficient to create a subscribership relationship (or exchange of value) vis-à-vis video services given the lack of allegations regarding exclusive content or enhanced access."); *Uproxx*, 2023 WL 8251590, at *5 ("[A] link to a video from Defendant's Website does not create a subscription relationship because any user can access the video on the Website."); *Heather*, 2023 WL 8788760, at *2 ("A newsletter of the sort in question here, which is comprised primarily of text and occasional external hyperlinks to video content . . . is outside the purview of the VPPA."). Holding otherwise would be akin to finding that a person who subscribes to "a print edition of New York magazine . . . that includes advertisements for films

---

%20Wednesday/23-
3217%20Lutfi%20Saalim%20v%20Walmart%20Inc%20et%20al.mp3.

or videos" thereby qualifies as a "subscriber" of the films or videos promoted therein.  *Carter,* 2023 WL 3061858, at *6.[11]

3.  Mr. Salazar's last redoubt is to contend that the term "subscriber" in the VPPA "should be read *not* to take its ordinary and common meaning."  Br. at 52 (emphasis added).  This undefined statutory term sheds its ordinary meaning, according to Mr. Salazar, because of the "symmetry . . . between the definitions of 'consumer' and 'video tape service provider."  *Id.* at 51.  Because the parallel phrases in those provisions—"renter, purchaser, or subscriber" and "rental, sale, or delivery"—pair subscriber with delivery, Mr. Salazar concludes that *any* delivery of audiovisual content is a "subscription" for purposes of the VPPA.  As he puts it, "'subscriber' becomes more akin to 'recipient,'" and he "is a statutory 'subscriber' because he accepted delivery of video content while browsing 247Sports.com."  Br. at 53.

Mr. Salazar's reading again violates well-accepted principles of statutory interpretation.  "When a term goes undefined in a statute, [courts] give the term its ordinary meaning."  *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 566 (2012). If Congress had wanted all recipients of video materials to be covered, it would have

---

[11]  Although Mr. Salazar contends that the example Newsletter attached to Paramount's motion contained links that "directed subscribers like Mr. Salazar to video content[,]" he acknowledges that these pages also included text "articles."  Br. at 19-20 n.1.

said "recipient" and not "subscriber." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) ("It is not our function 'to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have' intended."); *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 579 U.S. 115, 130 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted" (internal quotation marks omitted)). Or, failing that, it would have at least defined "subscriber" to mean recipient, just as it defined four other statutory terms in the VPPA.

And if Congress had intended "subscriber" to mean "recipient," it would not have placed that term alongside "renter" and "purchaser". "Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps. [T]his canon is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Dubin*, 599 U.S. at 124-25 (citation omitted). By grouping "subscriber" with "renter" and "purchaser," Congress plainly intended to capture meaningful commercial relationships and not merely the passive receipt of video content on a website. That is especially clear because, under Mr. Salazar's interpretation, the terms "renter" and "purchaser" do no work at all and are rendered superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("one of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no

part will be inoperative or superfluous") (internal quotation marks omitted).  Any video purchaser or renter is also a recipient, so under Mr. Salazar's atextual interpretation, all Congress had to say was subscriber.

And yet again, Mr. Salazar's reading of the statute conflicts with the relevant authorities, including the 11th Circuit's decisions in *Ellis*, 803 F.3d at 1256-57, and *Perry*, 854 F.3d at 1342, and related case law which has made clear that casual visitors of a website do not have a claim. *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (explaining plaintiff's casual "visits to AMC's website to view various videos . . . without any attempt to affiliate with or connect to the provider, exhibits none of the critical characteristics of 'subscription[.]'"); *Alex*, 2023 WL 6294260, at *3 ("Plaintiffs' viewing of public content on the provider's website is not enough to qualify as a consumer under the VPPA."); *Markels v. AARP*, No. 4:22-CV-5499-YGR, 2023 WL 6411720, at *3 (N.D. Cal. Aug. 29, 2023) (finding plaintiffs were not VPPA subscribers where "the videos [were] readily available to anyone who visits the site."); *Cf. Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) ("[B]y installing the App on his phone . . . Yershov established a relationship with Gannett that is materially different from what would have been the case had USA Today

simply remained one of millions of sites on the web that Yershov might have accessed through a web browser.").[12]

## II. Mr. Salazar Failed to Plausibly Allege A VPPA Violation for Other Reasons

The District Court correctly dismissed Mr. Salazar's VPPA claim on the basis that he was not a "subscriber of goods or services from a video tape service provider" under the VPPA. *See* Memorandum Opinion and Order, RE 33, Page ID # 287. However, even if Mr. Salazar were properly considered a subscriber under the VPPA—which he is not—his VPPA claim fails for other reasons, including because (A) Mr. Salazar did not plausibly allege that Paramount knowingly disclosed PII, and (B) Mr. Salazar does not allege that he watched pre-recorded, as opposed to live-streamed videos.[13]

Mr. Salazar contends that these issues should be left to the District Court to resolve. Br. at 20 n.2. But this Court has the discretion to consider an argument not

---

[12] Mr. Salazar also contends that the District Court incorrectly held that he failed to allege he viewed videos on 247Sports.com. Br. at 28 n.5. But the allegations to which he points to rebut this finding assert that he viewed "Video Media[,]," which the Complaint defined as "data containing . . . the computer file containing video and its corresponding URL viewed[.]" *Id.*; Complaint, RE 1, Page ID #10. Indeed, the Complaint does not clearly allege that Mr. Salazar viewed videos on 247Sports.com.

[13] Mr. Salazar argues on appeal that he has Article III standing to bring his claim. Br. at 54-55. The District Court found that Mr. Salazar had standing, and Paramount is not arguing standing in this appeal. Memorandum Opinion and Order, RE 33, Page ID # 281.

decided by the District Court where "it is 'presented with sufficient clarity and completeness and its resolution will materially advance the progress of . . . litigation.'" *D.D. v. Scheeler*, 645 F. App'x 418, 423 (6th Cir. 2016) (quoting *In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001)). Here, as in *Scheeler*, because these arguments were fully briefed in connection with Paramount's motion to dismiss below, "the factual record does not need expansion, and a decision on the merits will save judicial resources." *Id.* (exercising its discretion to consider the merits of an argument not decided by the district court). Thus, this Court can consider the following arguments as alternative bases to affirm the District Court's opinion if necessary (which it likely is not). Both of these arguments provide an independent basis for dismissal of the complaint.

## A. Paramount Did Not Knowingly Disclose PII

Mr. Salazar did not plausibly allege that Paramount knowingly disclosed PII. Mr. Salazar's allegations regarding PII revolve around the alleged disclosure of Facebook IDs ("FIDs"), which he claims are combined with information about "video content viewed" to link a user's identity to certain video watching information. Complaint, RE 1, Page ID #2, 9, 10-12. FIDs are allegedly disclosed through "personally identifiable FID cookies." *Id.* at Page ID #9. The only such cookie Mr. Salazar specifically references is Meta's c_user cookie, which Mr. Salazar points to as containing "the viewer's FID." *Id.* at Page ID # 12.

As these allegations suggest, the c_user cookie is a vehicle by which an FID may be transmitted to Meta. *See Hulu*, 86 F. Supp. 3d at 1093-94 (explaining that use of a "Like button would cause a 'c_user' cookie to be sent to Facebook," and that the c_user cookie contained "the logged-in user's Facebook user ID expressed in a numeric format."). But Meta's website establishes—and Mr. Salazar did not contest, when Paramount raised this point below—that the c_user cookie is *Meta's* cookie, not Paramount's. Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies/.[14] Accordingly, to the extent any disclosure of c_user cookies or FIDs occurred, such disclosure occurred between the user's browser and Facebook.

Moreover, nowhere in the Complaint does Mr. Salazar allege that Paramount ever possessed his FID or any "personally identifiable FID cookies." Complaint, RE 1, Page ID #9. This omission is fatal to Mr. Salazar's claim, because a party cannot disclose information that it does not itself have, as other courts have recognized. *See Eichenberger v. ESPN, Inc*., 876 F.3d 979, 986 (9th Cir. 2017) (rejecting VPPA claim where the defendant "never disclosed and apparently never even possessed" the information that would allow a third party to identify an individual); *Yoder v. Ingersoll-Rand Co*., 31 F. Supp. 2d 565, 571 (N.D. Ohio 1997)

---

[14] The Court may consider Facebook's website. Complaint, RE 1, Page ID #10; *Clark*, 2023 WL 2787325, at *2; *Marshall*, 2023 WL 2707222, at *2.

(granting motion for summary judgment against invasion of privacy claim where defendant did not know it had received a confidential medical record, and noting "[i]t is a logical impossibility for a party intentionally to disclose information that it does not know it has."); *Tansil v. Grange Ins. Co. of Mich.*, No. 12-13439, 2014 WL 12658836, at *2 (E.D. Mich. Feb. 5, 2014) (denying motion in limine seeking to preclude plaintiff from calling certain witnesses where she failed to provide information she presumably did not know about these witnesses, and noting "[t]he plaintiff cannot disclose what she does not know[.]"), *aff'd*, 172 F.3d 51 (6th Cir. 1998) (unpublished table decision).

Moreover, the Complaint specifically alleges that the "personally identifiable FID cookies" reside "on [a Facebook user's] *browser*." Complaint, RE 1, Page ID #9 (emphasis added). It does not allege—nor could it—that Paramount is the entity that put these "personally identifiable FID cookies" on the user's browser, or that Paramount is the entity that transmits the FID cookies to Facebook. Rather, Mr. Salazar alleges that "the digital subscribers [sic] identity" is "transmitted to Facebook by the user's *browser*." *Id.* (emphasis added). The fact that any information about a user's identity is transmitted by the user's browser rather than Paramount means that Paramount itself cannot have disclosed PII. After all, in order to "disclose" information, one must necessarily "send[], transmit[], communicat[e], or distribut[e] it." *Peerless Ins. Co. v. Law Offices of Jason E. Taylor P.C.*, No. 19-

cv-126, 2020 WL 4370941, at *3 (W.D.N.C. July 8, 2020), *adopted by*, 2020 WL 4369446 (W.D.N.C. July 30, 2020). Since, per Mr. Salazar's own allegations, Paramount did not transmit any "FID cookies," it could not have disclosed such cookies to Facebook.

And if Paramount did not disclose the only identifying information alleged in the Complaint, it could not have knowingly disclosed PII, as required for a VPPA claim. 18 U.S.C. § 2710(b)(1). Indeed, it is "the information actually 'disclose[d]' by a 'video tape service provider,' which must itself do the identifying that is relevant for purposes of the VPPA . . . not information disclosed by a provider" (here, video watching information from Paramount) "plus other pieces of information collected elsewhere by non-defendant third parties" (here, "FID cookies" from Meta transmitted via the user's browser). *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 181-83 (S.D.N.Y. 2015) (finding that if a third party has to "reverse engineer" PII, there can be no knowing disclosure of PII).

Moreover, the conditions that were required for the c_user cookie to have been transmitted to Meta—including whether any visitor to the 247Sports.com website was a Facebook user, was logged in to Facebook, had their browser configured to allow cookies, or had the c_user cookie installed on their browser—were never visible to Paramount. *See In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 2758598, at *21-22 (N.D. Cal. June 17, 2014) (explaining that whether users had

logged into Facebook and blocked cookies could affect whether disclosures occurred via the c_user cookie).

Indeed, Mr. Salazar does not allege Paramount "ever used, or even [could] use, *their* [FIDs] to identify *them* or *their* video-watching habits." *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-cv-65-AW-MAF, 2023 WL 8544765, at *7 (N.D. Fla. Oct. 6, 2023); *see also Hulu*, 86 F. Supp. 3d at 1093 n.3 ("The only servers that can access a particular cookie are those associated with the domain that wrote the cookie."). Because Paramount therefore could not have known "it was conveying PII," it was impossible for it to have "knowledge of the [alleged] conveyance." *Bernardino v. Barnes & Noble Booksellers, Inc*., Case No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017).

Mr. Salazar also failed to plausibly allege that *his* identity was disclosed. In the Complaint, Mr. Salazar provides an example of an FID allegedly being sent via Facebook's c_user cookie:

```
cookie: sb=5HftYmuKvY9744LJOIj0fWM8; datr=T3_tYn4t9lhm5ShZA4tHvGlR; dpr=1.5; c_user=100003190670927; xs=40%3ADRvBU-LlwPna1g%3A2%3A16620
66646%3A-1%3A2997%3A%3AAcUXVo5HajbV6I-W5pNnYbgkr8jMtUd3c1OkGOn-rw; fr=0QOjNEJTF6Qgay0WC.AWVIvtIsg4G5ef3T0MiUGttl9qM.BjGOLV.U8.AAA.0.0.
BjGOLV.AWVTHDN3h_Q
```

Complaint, RE 1, Page ID #12 (alleging the FID is shown in the "c_user field."). But this FID is not Mr. Salazar's FID—if one appends this FID to the Facebook website URL (*i.e.*, www.facebook.com/100003190670927) while logged into Facebook, it does not lead to the Facebook profile of Mr. Salazar, it leads to the

Facebook profile of an unrelated person named Jacob Brown.

In addition, Mr. Salazar failed to allege his public Facebook profile contained "any personal information, such as [his] name[] or email address[.]" *Ghanaat v. Numerade Labs*, No.: 4:23-cv-00833-YGR, 2023 WL 5738391, at *4 (N.D. Cal. Aug. 28, 2023). He has therefore failed to plausibly allege that "anyone ordinary person" could use his FID to "look up" his "name." Complaint, RE 1, Page ID #9. As district courts have recognized, if an FID does not lead to personal information about the individual, it cannot be PII: *i.e.*, information which "*identifies a person* as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3) (emphasis added); *Ghanaat*, 2023 WL 5738391, at *4 (an FID is not PII unless "it leads to a Facebook page that discloses personal and identifying information about the consumer."); *see also Solomon v. Flipps Media, Inc.*, No. 22-cv-5508 (JMA) (JMW), 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30, 2023) (same), *appeal filed*, No. 23-7597 (2d Cir. Nov. 1, 2023).

Mr. Salazar also failed to plausibly allege that Paramount disclosed PII because his Complaint at most shows the disclosure of a webpage name and/or article title, not information identifying "a person as having requested or obtained *specific video materials or services*." Complaint, RE 1, Page ID #11-12; 18 U.S.C. § 2710(a)(3) (emphasis added). The Complaint points to a video in "an article titled 'UCF LB Terrence Lewis, former 5-star recruit, plans to transfer[,]" and in a

screenshot, purports to show the disclosure of "the content name of the video the digital subscriber watched." Complaint, RE 1, Page ID #12. The screenshot, however, at most shows the article title and URL:

```
:path: /tr/?id=1575186632756631&ev=PageView&dl=https%3A%2F%2f247sports.com%2FArticle%2FUCF-LB-Terrence-Lewis-former-5-star-recruit-plan
s-to-transfer 192864085%2F&rl=https%3A%2F%2F247sports.com%2F&if=false&ts=1662575409235&sw=1280&sh=720&v=2.9.79&r=stable&ec=0&o=30&fbp=
fb.1.1662575124580.1540724331&it=1662575407479&coo=false&rqm=GET&dt=cyupj86xcwnl3f6fip3plz8jdwn8wml1
```

In other words, the Complaint itself shows "that the defendants do not disclose information showing that a person has 'requested or obtained specific video materials or services.'" *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284-85 (S.D.N.Y. Feb. 17, 2023). As one district court has recognized, "disclosing to a third party the title of the webpage does not reveal the title of a video on the page, let alone whether the website visitor requested or obtained the video instead of merely reviewing an article on the page." *Id.*

For these reasons, Mr. Salazar failed to plausibly allege that Paramount knowingly disclosed PII.

### B. Mr. Salazar Did Not Plausibly Allege He Watched Prerecorded Videos on 247Sports.com

Even if this Court rejects Paramount's other arguments, the District Court's ruling should still be affirmed because Mr. Salazar failed to plausibly allege that he watched prerecorded, rather than live-streamed, videos on 247Sports.com.[15] The

---

[15] 247Sports.com offers live-streamed video content. *See, e.g.,* Brandon Marcello, *Live video: 4-star RB Mark-Antony Richards announcement*,

VPPA concerns only entities involved in the "rental, sale, or delivery of *prerecorded* video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4) (emphasis added).  Every court to consider this issue has found that "a video must be prerecorded to fall within the VPPA's definition of 'similar audio visual materials.'" *Stark v. Patreon, Inc*., 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022); *Walker v. Meta Platforms, Inc.*, No. 22-cv-02442-JST, 2023 WL 3607282, at *6-7 (N.D. Cal. Mar. 3, 2023); *Louth v. NFL Enters. LLC*, No. 121CV00405MSMPAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022); *Solomon*, 2023 WL 6390055, at *4.  Nowhere did Mr. Salazar allege that any videos he watched were prerecorded.  Accordingly, he failed to allege that 247Sports.com provided him with "similar audio visual materials" such that his claim falls within the statute's ambit.

## III. The District Court Correctly Rejected Mr. Salazar's Request for Leave to Amend

Mr. Salazar contends that even if his complaint were properly dismissed, he should have been granted leave to amend.  Br. at 49-51.  But Mr. Salazar failed to specify any proposed basis for his amendment in his briefing below.  Opposition to Motion to Dismiss, RE 24, Page ID # 146 n.17.  His request for leave to amend

---

https://247sports.com/college/auburn/Article/Live-video-4-star-RB-Mark-Antony-Richards-announcement-128777702/; Jamie Oakes, *LIVE stream: Implosion of UVA's UHall*, https://247sports.com/Article/Virginia-Cavaliers-Basketball-LIVE-stream-Implosion-of-UVA-UHall-University-Hall-House-that-Ralph-Sampson-built-demolition-132312764/.

consisted only of a one-sentence footnote on the final page of his opposition to the motion to dismiss, which said nothing about the nature of potential amendments: "To the extent the Court grants Defendant's motion, Plaintiff respectfully requests that he be permitted to amend his complaint to address any issues the Court raises in its Order." *Id.*

Such a request did not merit granting leave to amend. The "default rule" is that where, as here, a plaintiff "does not file a motion to amend or a proposed amended complaint in the district court, it is not an abuse of discretion for the district court to dismiss the claims with prejudice." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 844 (6th Cir. 2012); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 628 (6th Cir. 2019) (affirming denial of leave to amend where "plaintiffs included only a cursory request at the end of their opposition to Defendants' motion to dismiss: 'If this Court should find that any of Plaintiffs claims are lacking, Plaintiffs respectfully requests this Court grant leave for Plaintiffs to amend the complaint and this leave should be freely given.'").

The District Court also did not abuse its discretion in rejecting the request for leave to amend because Mr. Salazar did not explain in his briefing below how an amendment would "cure the deficiencies of his complaint." Opposition to Motion to Dismiss, RE 24, Page ID # 146 n.17; *Bliss v. Corr. Corp. of Am.*, 8 F. App'x 320, 321 (6th Cir. 2001) (concluding "the district court did not abuse its discretion by

denying Bliss's motion to amend his complaint[,]" and explaining "Bliss failed to demonstrate the need for amendment or otherwise explain his reasons for requesting leave to amend.").

On appeal, Mr. Salazar vaguely asserts that he should have been permitted to "add allegations about whether and to what extent Paramount's online newsletter gave subscribers exclusive content or access to video content." Br. at 50-51. But "[a]bsent extraordinary circumstances[,]" "'this court generally will not consider an argument not raised in the district court and presented for the first time on appeal,'" *Holloway v. United States*, No. 19-5094, 2020 WL 497188, at *2 (6th Cir. Jan. 9, 2020), including new proposed amendments. *Talmer Bank & Tr. v. Minton Firm, P.C.*, 660 F. App'x 439, 448 (6th Cir. 2016) (citation omitted) ("[T]he appropriate method for adding new factual allegations to a complaint is not via an appellate brief, but by filing an amended complaint.").

Even on appeal, Mr. Salazar still fails to explain how an amended complaint would cure the pleading deficiencies of his original complaint. *Crosby*, 921 F.3d at 628 (noting plaintiffs "failed to explain how a second amended complaint would resolve the problems in the first amended complaint" in affirming denial of leave to amend). He still does not contend that the Newsletter contained videos or that the Newsletter gave him exclusive access to 247Sports.com video content. Br. at 49-51. At most, he contends that the receipt of emails with links to the 247Sports.com

website make him a "subscriber" as defined by the VPPA—a meritless claim in light of the statute's plain text and recent case law interpreting it. *E.g.*, *NBA*, 2023 WL 5016968, at *10. Accordingly, Mr. Salazar's proposed amendment would be a futile amendment of the complaint, and should be rejected here. *Christian v. Altaire Pharms., Inc.*, No. 20-6360, 2021 WL 3578812, at *2 (6th Cir. Aug. 10, 2021).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's decision for the reason relied upon by the District Court, as well as the alternate reasons set forth in this brief.

January 26, 2023

Respectfully submitted,

By: */s/ David L. Yohai*
David L. Yohai
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
david.yohai@weil.com

Robb S. Harvey
HOLLAND & KNIGHT LLC
511 Union Street, Suite 2700
Nashville, TN 37219
(615) 244-6380
robb.harvey@hklaw.com

*Counsel for Defendant-Appellee*
*Paramount Global*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because:

        this brief contains <u>10,462</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(f) and 6 Cir. R. 32(b)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

January 26, 2023                Respectfully submitted,

                           By: <u>*/s/ David L. Yohai*</u>
David L. Yohai
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
david.yohai@weil.com

Robb S. Harvey
HOLLAND & KNIGHT LLC
511 Union Street, Suite 2700
Nashville, TN 37219
(615) 244-6380
robb.harvey@hklaw.com

*Counsel for Defendant-Appellee*
*Paramount Global*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

Statutory Provisions.............................................................. A-1

Designation of Relevant District Court Documents........................................... A-5

i

# 18 U.S.C. § 2710. Wrongful disclosure of video tape rental or sale records

(a) DEFINITIONS.—For purposes of this section—

(1) the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

(2) the term "ordinary course of business" means only debt collection activities, order fulfillment, request processing, and the transfer of ownership;

(3) the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4) the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

(b) VIDEO TAPE RENTAL AND SALE RECORDS.—

(1) A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).

(2) A video tape service provider may disclose personally identifiable information concerning any consumer—

(A) to the consumer;

(B) to any person with the informed, written consent (including through an electronic means using the Internet) of the consumer that—

(i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;

(ii) at the election of the consumer—

(I) is given at the time the disclosure is sought; or

(II) is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner; and

(iii) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election;

(C) to a law enforcement agency pursuant to a warrant issued under the Federal Rules of Criminal Procedure, an equivalent State warrant, a grand jury subpoena, or a court order;

(D) to any person if the disclosure is solely of the names and addresses of consumers and if—

(i) the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and

(ii) the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material; however, the subject matter of such materials may be disclosed if the disclosure is for the exclusive use of marketing goods and services directly to the consumer;

(E) to any person if the disclosure is incident to the ordinary course of business of the video tape service provider; or

(F) pursuant to a court order, in a civil proceeding upon a showing of compelling need for the information that cannot be accommodated by any other means, if—

(i) the consumer is given reasonable notice, by the person seeking the disclosure, of the court proceeding relevant to the issuance of the court order; and

(ii) the consumer is afforded the opportunity to appear and contest the claim of the person seeking the disclosure.

If an order is granted pursuant to subparagraph (C) or (F), the court shall impose appropriate safeguards against unauthorized disclosure.

(3) Court orders authorizing disclosure under subparagraph (C) shall issue only with prior notice to the consumer and only if the law enforcement agency shows that there is probable cause to believe that the records or other information sought are relevant to a legitimate law enforcement inquiry. In the case of a State government authority, such a court order shall not issue if prohibited by the law of such State. A court issuing an order pursuant to this section, on a motion made promptly by the video tape service provider, may quash or modify such order if the information or records requested are unreasonably voluminous in nature or if compliance with such order otherwise would cause an unreasonable burden on such provider.

(c) CIVIL ACTION.—(1) Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court.

(2) The court may award—

(A) actual damages but not less than liquidated damages in an amount of $2,500;

(B) punitive damages;

(C) reasonable attorneys' fees and other litigation costs reasonably incurred; and

(D) such other preliminary and equitable relief as the court determines to be appropriate.

(3) No action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery.

(4) No liability shall result from lawful disclosure permitted by this section.

(d) PERSONALLY IDENTIFIABLE INFORMATION.—Personally identifiable information obtained in any manner other than as provided in this section shall not be received in evidence in any trial, hearing, arbitration, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State.

(e) DESTRUCTION OF OLD RECORDS.—A person subject to this section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (b)(2) or (c)(2) or pursuant to a court order.

(f) PREEMPTION.—The provisions of this section preempt only the provisions of State or local law that require disclosure prohibited by this section.

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Docket Entry Number | Description | Page ID Number |
|---|---|---|
| RE 1 | Complaint | Page ID # 1-21 |
| RE 16 | Motion to Dismiss | Page ID # 65-67 |
| RE 17 | Memorandum of Law In Support of Motion to Dismiss | Page ID # 68-94 |
| RE 17-1 | Exhibit A to Memorandum of Law in Support of Motion to Dismiss | Page ID # 95-101 |
| RE 24 | Opposition to Motion to Dismiss | Page ID # 120-147 |
| RE 26 | Reply Memorandum of Law in Support of Motion to Dismiss | Page ID # 172-186 |
| RE 33 | Memorandum Opinion and Order | Page ID # 265-287 |
| RE 34 | Judgment | Page ID # 288 |
| RE 35 | Notice of Appeal | Page ID # 289 |

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on January 26, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all CM/ECF users.

January 26, 2023                Respectfully submitted,

                                    By: */s/ David L. Yohai*
                                    David L. Yohai
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, NY 10153
                                    (212) 310-8000
                                    david.yohai@weil.com

                                    Robb S. Harvey
                                    HOLLAND & KNIGHT LLC
                                    511 Union Street, Suite 2700
                                    Suite 203
                                    Nashville, TN 37219
                                    (615) 244-6380
                                    robb.harvey@hklaw.com

                                    *Counsel for Defendant-Appellee*
                                    *Paramount Global*